FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
15 Dec. 2023 7:38 AM
Lucy H. Carrillo, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

No IFP subm.

CC: HG/Filer (by email)

| | |
|---|---|
| *KYEANN SAYER*<br><br>Plaintiff,<br><br>vs.<br><br>*THE UNIVERSITY OF HAWAI'I AT MANOA*<br><br>Defendant. | **Complaint for a Civil Case**<br><br>Case No. 23-00600-HG-RT<br>*(to be filled in by the Clerk's Office)*<br><br>Jury Trial:   X Yes   ☐ No<br>*(check one)* |

**I.     The Parties to This Complaint**

    **A.     The Plaintiff(s)**

| | |
|---|---|
| Name | Kyeann Sayer |
| Street Address | 4100 Silver Avenue SE Apartment 313 |
| City and County | Albuquerque |
| State and Zip Code | New Mexico, 87108 |
| Telephone Number | 415.867.7379 |
| E-mail Address | kyeann@gmail.com |

    **B.     The Defendant**

| | |
|---|---|
| Name | The University of Hawai'i |
| Street Address | 2444 Dole Street |
| City and County | Honolulu |
| State and Zip Code | HI, 96822 |
| Telephone Number | 808.956.8111 |
| E-mail Address (if known) | |

**II.     Basis for Jurisdiction**

What is the basis for federal court jurisdiction?

    Federal question                 X  Diversity of citizenship

    Per Title 28, Section 1332 of the United States Code (28 U.S.C. § 1332(a)), this case meets the diversity jurisdiction threshold. Plaintiff's state of residence is New Mexico, and the amount at issue is above $75,000.

      1.      The Amount in Controversy

The amount in controversy is more than $75,000, not counting interest and costs of court, because Sayer had expenses in excess of $200,000, and is seeking $5 million in punitive damages.

### III. Statement of Claim

**Claim 1: Breach of Contract**

Sayer entered the University of Hawai'i as a PhD student in the History Department in Fall of 2015. Her GRE writing and verbal scores were in the top 90th percentile, and she had near-perfect grades (nothing lower than an A-) when pursuing her recent History and Russian Studies undergraduate and MA degrees (2013, 2015). Sayer had previously earned an MA in Cultural Studies (2008). Sayer was extra-procedurally dismissed at the end of the Fall 2019 semester, and administrators denied her the right of an appeal.

Sayer contends that she had a contractual relationship with the University that was breached. The contract was breached most significantly when Sayer was extorted to change her PhD field from 2018 to 2019, hazed and harassed relentlessly apparently to force her to bottom out to mitigate the University's damages for its breach of contract and fraud during that time, hazed to feed the students whom she taught (help them cheat), when administrators participated in the hazing and failed to hold faculty accountable for their breach of contract, when the University extra-procedurally dismissed her in December 2019 and failed to allow her to appeal or otherwise address the extra procedural dismissal by the end of the Fall 2019 term, when the Department Chair Matthew Lauzon covered up evidence of his extortion by not including the memo in which she was extorted in her departmental file, and when staff for University attorneys hazed/intimidated Sayer not to request her departmental file shortly before she became aware of the coverup during the summer of 2023. Administrators, attorneys, and members of the Board of Regents have been made aware of a deliberate attempt to cover up the exertion of Sayer to give up her field, but the institution has taken no responsibility, in continual breach of its implied contract with Sayer.

Faculty and administrators were not held accountable for violating or allowing the violation of grading procedures, breaking contracts or allowing faculty to break contracts, and following the rules set forth by the graduate division about resigning from dissertation committees.

Karen Kosasa was able to haze and intimidate Sayer into giving up freedom of inquiry with no consequences, though Sayer followed all administrative processes.

**Claim 2: False Advertising**

Pursuant to §708-871, Sayer contends that the university knowingly made or causes to be made a false or misleading statements when advertising the History Program and the University as a place where rules and procedures are followed, and where students are allowed freedom of inquiry.

Further, the University represents that its faculty are able or allowed to support students in their academic endeavors, and have expertise in their fields. Drs. Brown, Matteson, and

5

Lauzon seemed to lack the expertise to help Sayer go through the processes of preparing for comprehensive exams and dissertation research. They clearly had the ability to feed her from a set repertoire of books, but showed no interest in allowing her (or no ability to allow her) to form independent conclusions.

Sayer was clear about her intent in her Statement of Purpose. Aware that many or most historians work to create narratives to shape perceptions of history rather than simply trying to provide the most neutral information, Sayer was clear that she did not have side and wanted to go where the sources or literature took her. She was also clear about her time period, which coincided with her advisor's. By admitting Sayer, the department and University represented that they would help her develop as a scholar, and allow her freedom of inquiry. Instead, Fabio Lopez Lazaro, Keiko Matteson, Shana Brown, Matthew Lauzon, and Matthew Romaniello pressured Sayer to change time periods and to limit her inquiry.

First, Dr. Lopez-Lazaro designed the syllabus of the second half of a year-long course series that was required for World History majors so that it was impossible for Sayer to focus on her time period, and would only allow students to use a set group of sources. Additionally, Sayer learned through her own work that Dr. Romaniello had ignored key sources and information when writing the book that he workshopped extensively with Dean Arnade, Professor Lauzon, and others with the Early Modern working group. When working on comps readings, Drs. Lauzon and Matteson seemed specifically to want to limit Sayer's work focusing on religion. In Dr. Lauzon's case he was firmly resistant to allowing her to understand the Calvinist diaspora as it related to Russia in the Early Modern period. When working on her Modern China field with Dr. Brown, Dr. Brown seemed to want to prevent Sayer from reading works that eventually showed Sayer that Dr. Brown had not fully filled out her own work, and in so doing limiting our understanding of Chinese visual culture. It became clear the she also was ignoring vast amounts of literature.  It seems that Sayer would have been allowed to continue in the department if she had limited her scope per faculty instructions, and per faculty example. Alternately, if Sayer had been entrapped into giving up freedom of inquiry, the faculty may have used that as a pretext to dismiss her.

The History Department represented that it wants to train historians, and specifically true world historians, but the faculty showed a lack of commitment to allowing Sayer to go through the processes necessary to assimilate large amounts of information and truly understand very complex global processes. Instead, faculty members shamed Sayer for wanting to spend her time this way, and hazed her to restrict her inquiry as described above. There was no time given by committee members to discussing and evaluating her goals and work or what she truly needed to understand to do her work. As faculty members hazed Sayer to have her work limited, and essentially fed, Sayer continued to assimilate large amounts of material. They did not seem to want her to have the skills or time necessary to function independently as a historian. Sayer did the work she needed to become a historian in spite of the faculty members, who seemed to have no interest in the process of understanding historical literature or engaging in the analytical processes of doing history. The Department does not advertise that it limits and restricts its graduate students, and creates situations where they are forced to only read certain literature, and become dependent on faculty members to do their dissertations by virtue of the fact that faculty members do not train them.

Further, the department and University admitted Sayer to study Russian History, one of the PhD fields the History Department offered. Students were admitted to the Department to pursue a specific field. In a bait-and-switch, the department and University committed fraud

6

when they attempted to force Sayer to change fields, and dismissed her when she refused to do so. They did this with the full knowledge and support of the deans of Arts and Humanities, who participated in hazing and infantilizing Sayer. Fabio Lopez Lazaro, Keiko Matteson, Shana Brown, Matthew Lauzon, and Matthew Romaniello hazed Sayer to change time periods, areas of focus, and (after her advisor left the university), fields. Graduate Division Deans Maeda and Aune were aware of what was occurring. The University president, attorneys, and Board of Regents were also made aware that Sayer was not agreeing to be hazed into changing fields or giving up freedom of inquiry, and chose inaction. It seems that Sayer would have been allowed to continue in the department if she had been willing to change her field and allow faculty to feed her PhD prospectus. Alternately, if Sayer had succumbed to the pressure to give up her field, the faculty may have used that as a pretext to dismiss her.

The University and Department represented that it offered a Russian/Soviet History field, and when the Russian/Soviet historian resigned, allowed him to essentially abandon Sayer, and refused to find a viable alternative to allow her to continue to pursue Russian History. When Sayer refused to assent to changing fields, she was dismissed.

Additionally, the University and Department fraudulently represented that they provide GAships to train graduate students to become competent professors. It does not represent that GAs will be expected to participate in pushing students through classes that are not designed based on sound pedagogical theories, that they will be pressured to not calculate grades based on all of the work students have done, or that they will be intimidated into not doing all that is in their power to help struggling students, that they will have to mitigate the hostile environment created by the illegal/offensive behavior and comments of faculty, or that they will be pressured to feed students.

The History Department's 100-level World History lecture classes were not appropriately scaffolded so that students had the opportunity to succeed. In addition to all of her course commitments, as a TA for six semester-long courses, Sayer spent much time creating ways to supplement the curriculum so that students had the practice they needed to meet the assessment objectives in classes that created "designed to fail" scenarios. In Fall 2016, Sayer's advisor, Matthew Romaniello, expected Sayer to teach a 100-level class with him in which the first major assessment was a paper on an extremely difficult text. The class was not scaffolded with significant activities to help students prepare to write their papers. Sayer added a writing workshop, and met with numerous students to help them understand that text and the following texts students wrote on. She also gave them the opportunity to submit drafts to her. Sayer was responsible for grading lab work, and set the grading percentages to match those of the other World History classes. When it came time to submit grades, Dr. Romaniello pressured her to submit the information to him before the agreed-upon time, and before she had entered all of their scores, and to essentially give up the responsibility to grade to him (in the other classes, GAs calculated the grades). It was important for students to get appropriate credit for the parts of the class Sayer was grading because they were the only forms of assessment besides paper writing, and students needed to get credit for the work they did. It was shocking to have Dr. Romaniello want to submit the grades without performing final calculations. Sayer refused, and finished calculating all of the students' work before submitting the grades to her advisor. Later, a hardworking student complained to Sayer that her grade was lower than she expected. Apparently, Dr. Romaniello had given her a lower grade than she had earned. Sayer emailed her what she had calculated, and that she thought there must have been some mistake.

In Fall 2017, Sayer was threatened by Professor Sandra Swartz not to help students. When Sayer wouldn't submit, Swartz limited Sayer's teaching freedom, and Sayer had to more surreptitiously circumvent Dr. Swartz's efforts to prevent students from practicing the writing and analytical skills they needed to succeed on exams. Sayer reported this to the Graduate Chair, Matthew Lauzon, providing clear evidence of the threat, but refused to be enmired or have her time wasted further because Dr. Schwartz had turned over much of the lecturing in the class to Sayer, and given her very problematic materials that Sayer had to spend much time reorganizing and fact-checking. For example, in a class in which we discussed other regions' writing systems, the textbook ignored that there was an ancient Mesoamerican writing system. As in the other World History lecture classes, Sayer spent much of her time filling in gaps to give students complete information in addition to scaffolding to ensure that students had a chance to prepare for the assessments; she did not deserve to spend her time mired down in conflict of Dr. Schwartz's creation.

Sayer contends that if she would have been willing to participate in all of these activities, and not collected evidence of faculty wrongdoing along the way, faculty would not have wanted to dismiss Sayer. This expectation that Sayer would submit to illegitimate faculty authority to not effectively teach, to break the rules, violate students' rights, and help students cheat is not advertised as part of university literature or departmental and is in direct violation of the spirit of education and university rules and therefore constitutes fraud.

The University represents that it has rules that students and faculty must follow, and that it will uphold those rules through due process procedures. This is one of the requirements for its accreditation, and it seems to have been hiding its complete lack of adherence to them during accreditation processes. As faculty members broke rules related to grading requirements for independent studies, resigning as committee members, allowing freedom of inquiry, enforcing Graduate Student Association processes, and intimidating Sayer, faculty, chairs, supervisors and administrators repeatedly simply ignored rules. Dr. Lauzon obviously outright lied about basic facts in a grading dispute, and was not held accountable. Dr. Lopez-Lazaro pressured Sayer to change her focus and time period, and then resigned from her committee when she wouldn't submit. Dr. Brown, as Department Chair, showed no willingness to hold him accountable. In violation of Graduate Division rules, Laurana O'Malley resigned from Sayer's committee without any explanation. The Graduate Division allowed her to, and refused to provide a rationalization.

Sayer stayed at the University and waited for it to take responsibility for all of the issues described above. Sayer rightly expected that university chairs, deans, and administrators would acknowledge all of the wrongdoing and rule breaking and hold faculty accountable. Meanwhile, it seems that chairs, faculty, and administrators were waiting for Sayer to become worn down enough to accept an unofficial line of authority to give up freedom of inquiry, and violate students' civil rights and the rights spelled out for them in university rules and literature. It seems that they also expected Sayer to succumb to unending scenarios in which she could have been entrapped in those activities. In retrospect, it seems that the point of admitting Sayer to the university was to intimidate, wear down, and entrap her into submitting to an unofficial line of authority at the university that is superseding written rules and law. When Sayer refused to submit, her career was disrupted.

**Claim 3: Deceptive Trade Practices**

Pursuant to §481A-3 (7), (8), and (9) the University misrepresented the services that it offers, indicating that it offered Russian/Soviet history, that it follows standard rules and

administrative procedures, and that it was not a place where faculty and administrators hazed and ritually emotionally abused students. Further, when faculty failed to entrap Sayer or prevent her from doing her work, in the Spring of 2018, in the wake of her advisor informing her that he was resigning, Professors Lauzon, Brown, and Matteson commenced a relentless campaign of hazing and harassment, attempting to force Sayer to have her work fed by them. When Sayer refused, they set up pretexts to suddenly give her terrible grades.  They flagrantly and egregiously misrepresented her in proceedings and hearings, apparently with the goal of denigrating her work if they couldn't coerce her into having her work fed by their network.  They couldn't bring Sayer into their fold, so they sought to non-compete her.

In retrospect, it seems that the point of admitting Sayer to the university was to bring her into having her work fed by faculties' networks, or, failing that, destroy Sayer's career.

**Claim 4: Breach of the Covenant of Good Faith and Fair Dealing**

Per §490:1-304 Obligation of good faith, pursuant to the above Fraud and Breach of Contract claims, the university had an obligation not to take action that would prevent Sayer from benefitting from her contractual relationship with it. By committing the offenses described above in Claims 1 - 3, the covenant of good faith and fair dealing was repeatedly breached.

Further, as Sayer resisted having her work fed and showed that she expected the university to take responsibility for allowing Sayer to pursue her field at UH, Drs. Lauzon, Matteson, and Brown sent more and more nonsensical communications, seemed designed to pretend to feed Sayer information, or simply designed to provide evidence that they needed to justify not following rules and procedures. It was very distressing for Sayer to be in a position to show that she was not engaged in any "covert" communication with faculty who were abusing her. It seemed as though they were claiming some kind of unofficial authority to force her to bottom out and ruin her career as they hazed her to give up any expectation that the administration would hold them accountable. Sayer was not part of their network(s) and was not in any way under any kind of unofficial command, and at times felt the need to cut off their communication so they could not pretend that she was. For the university to put her in this position, and pressure her to submit to their authority, showed extreme bad faith.

The University could have mitigated damages by taking responsibility for its obligation to allow Sayer freedom of inquiry, hold faculty accountable for breaking their contracts and University rules, follow its own rules and procedures, and its obligation to allow Sayer to pursue the field she was admitted to pursue.  Instead, attorneys and administrators decided to mitigate damages by pursuing a path of hazing and distressing Sayer, driving her to bottom out. Most students would have had a breakdown under the circumstances Sayer endured, or they would have been worn down into accepting faculty and administrator authority to allow students to be set up, to not teach effectively, and to have her work fed and circumscribed. Another strategy seems to have been entrapping her into helping students cheat, or otherwise compromising her with the use of students, a strategy which continued into her final 2019 semester. This decision to mitigate damages by harming Sayer showed extreme bad faith.

9

IV. **Relief**

Pursuant to §481A-4, Sayer seeks costs and attorney's fees for Deceptive Trade Practices. Sayer seeks $200,000 in student loans, and $200,000 compensation in time lost in a situation in which she set up to non-compete.

Pursuant to §481A-4, if she does not prevail on her deceptive trade practices claim, Sayer seeks costs and attorney's fees for False Advertising. Sayer seeks $200,000 in student loans, and $200,000 compensation in time lost in a situation in which she set up to non-compete.

Per 663-1.2, if she does not prevail on her breach of the covenant of good faith and fair dealing claim, Sayer seeks punitive damages for wanton breach of contract. Sayer requests $5 million. Rather than simply being given the opportunity to thrive as a scholar, she spent her time maneuvering around faculty whose intent was not to help her grow and develop, and teaching classes in which she had to work extensively to provide students accurate information, and to mitigate potential damages for the University resulting from classes that were not designed to help students learn and succeed. Sayer mitigated damages for the University by preventing unfair grading, intervening when faculty were violating federal law, and adding tremendous value to all of the classes she taught. She mitigated damages for the lack of faculty guidance by working independently. Sayer could have spent her time at a University where she did not have to combat faculty to do her work, and where she was not hazed and harassed. She could have built relationships with faculty who wanted to nurture and support her, and further her career. She could have been at an institution that would hold faculty accountable for breaking their contracts and University rules. Instead, she lost years of her life at UH Manoa. Sayer expected to finish her dissertation and become a professor. Instead, her career was disrupted and she was left saddled with debt, and extremely wary of entering another "bait and switch" situation at another institution.

Sayer developed a medical condition in part as a result of the nonstop stress she endured. She lost hours and days of her life coping with the hazing and harassment, as well as the profound disappointment of having her career ruined.

Per 663-1.2, if she does not prevail on her breach of contract claim, Sayer seeks punitive damages for breach of the covenant of good faith and fair dealing. Sayer requests $5 million. In addition to the section above, Sayer has given university administrators and attorneys ample opportunities to take responsibility for the egregious bad faith exhibited by faculty and administrators, when they were provided direct evidence in 2023 that Dr. Lauzon covered up his campaign to extort her to change fields, but without result.

Sayer developed a medical condition in part as a result of the nonstop stress she endured. She lost hours and days of her life coping with the hazing and harassment, as well as the profound disappointment of having her career ruined.

V. **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A. **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing, December 15, 2023.

Signature of Plaintiff       s/ Kyeann Sayer
 Printed Name of Plaintiff     Kyeann Sayer